**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JEROME BALDYGA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:06-cv-0697 (WWE) |
| | : | |
| CITY OF NEW BRITAIN and | : | |
| JOSEPH CARILLI | : | |
| Defendants. | : | |

**MEMORANDUM OF DECISION ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This action arises from plaintiff Jerome Baldyga's claims that defendants City of New Britain and Joseph Carilli discriminated against him on the basis of disability and perceived disability and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., violated his rights under the Equal Protection Clause of the Fourteenth Amendment, retaliated against him in violation of the First Amendment and section 31-51q of the Connecticut General Statutes and denied him his due process rights under the Due Process Clause of the Fourteenth Amendment. Now pending before the Court is defendants' Motion for Summary Judgment (Doc. #25). For the following reasons, defendants' Motion will be granted.

The Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331 as to plaintiff's federal law claims and pursuant to 28 U.S.C. § 1367 as to plaintiff's state law claims.

**BACKGROUND**

The parties have submitted briefs, a stipulation of facts and supporting exhibits.[1] This evidence reflects the following factual background.

Plaintiff was employed by the City of New Britain in the Public Works Department, initially as a General Laborer. Defendant Joseph Carilli was the Director of Public Works at all relevant times, until September 3, 2004. John Byrne, not a defendant in this case, was the Personnel Director for the City of New Britain at all relevant times, until June 4, 2004.

Evaluations of plaintiff's job performance from 1994 through 2000 indicate mostly favorable reviews. At the same time, plaintiff's tenure was also marked by numerous disciplinary actions, reprimands and suspensions for various violations. These include the following:

- In June 1996, plaintiff, his union and defendant City entered into a Memorandum of Agreement and plaintiff was suspended after he was caught in possession of and/or consumption of alcoholic beverages during normal work hours;

- In August 1996, plaintiff received a letter of warning after using a City vehicle to travel to his home during a break;

---

[1] To the extent that plaintiff's Rule 56(a) statement does not comply with the Local Rules of Civil Procedure, the Court has disregarded such evidence. For example, plaintiff has provided unsworn statements of his former coworkers that do not meet the requirements of Local Rule 56(a)(3) in that they are not sworn statements contained in an affidavit or deposition. See Fed. R. Civ. P. 56(e) (On a summary judgment motion, "[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.").

- In June 1998, plaintiff was suspended and placed in an initial probationary period for falsifying his domicile on his employment application;

- In May 2000, plaintiff was arrested for driving under the influence of alcohol and had his driver's license revoked; plaintiff agreed to a reduction in rank and additional disciplinary measures;

- In June 2001, plaintiff was suspended for two motor vehicle accidents;

- In October 2001, plaintiff received a letter of caution for leaving the work site in a private vehicle without authorization;

- In June 2002, plaintiff was set to be punished for going to his property in the City during work time and attending a local festival for personal reasons in a city vehicle and during work time.

In response to many of these accusations, plaintiff alleges that the violations for which he was punished were prevalent and engaged in by many other employees without any sort of punishment.

On July 29, 2002, plaintiff delivered a letter from his physician, Francis Zayas, to Byrne stating that plaintiff was in treatment for a gastrointestinal condition and losing weight and that Dr. Zayas believed that plaintiff would benefit from a medical leave of absence. On July 31, 2002, Carilli responded to plaintiff via a letter informing plaintiff that if he wanted to be covered under the Family and Medical Leave Act, Dr. Zayas would have to complete a "Certification of Physician or Practitioner" form. Dr. Zayas alerted Byrne on August 13 that plaintiff could return to normal work duty on August 26. In the Certification of Physician or Practitioner form, Dr. Zayas indicated that plaintiff's condition required him to take medicine which had side effects including "severe

fatigue, malaise, anemia, etc.," that this condition would last from "months to years" and that plaintiff would have to take three to four weeks off from work. Dr. Zayas further stated that plaintiff's condition reached the level of "Absence Plus Treatment."

In response, on August 21, 2002, Carilli wrote plaintiff stating that there was confusion over Dr. Zayas's form that needed clarification. The following day, Byrne wrote Dr. Zayas informing him that page two of the certification form was missing and asking Dr. Zayas if plaintiff's condition prevented him from driving a truck and whether the duration of the illness would affect plaintiff's ability to perform his work. Karleen Hanna, a representative of Dr. Zayas's practice, responded to Byrne by letter on August 30 indicating that (1) plaintiff was no longer taking medication prescribed by "this office;" (2) plaintiff's condition would not affect his ability to work; and (3) he was presently able to return to work, although a relapse could require absences in the future.

On September 23, Carilli wrote to plaintiff demanding that plaintiff provide a list of all currently-prescribed medications by the end of the following work day. The following day, Carilli wrote to plaintiff's union president that plaintiff had returned to full work duty and that he would be suspended without pay for twenty days and placed on an initial probationary status through October 1, 2004 in view of the June 2002 infraction. Plaintiff filed a grievance in response to this suspension and probation. On September 25, plaintiff left a list of the medications he was taking for Carilli. Despite plaintiff having provided Carilli with this list, plaintiff was further disciplined for failing to provide a list of his medications by the deadline imposed in the September 23 letter.

On October 23, plaintiff was notified by Carilli that his twenty-day suspension which was to run through noon on October 24, would continue through the whole day.

4

In addition, plaintiff was be placed on "Authorized Leave with Pay" commencing on October 25.  Also on October 23, during a grievance proceeding, plaintiff admitted that he was attending Narcotics Anonymous, a pain management clinic and an Employee Assistance Program.

On November 13, Carilli sent plaintiff a letter informing him that the medications that plaintiff was "currently taking" may adversely affect his ability to operate a motor vehicle - a "critical" element of his duties - and that he would have to take these medications for the long term.  Because of this, plaintiff's job status was being changed to "authorized leave without pay" for which he could use his accrued sick leave.  Carilli also notified plaintiff that there was a fact finding hearing pending related to the conduct described in Carilli's September 23 letter and that such hearing was not being scheduled as plaintiff "should not be operating a motor vehicle."

In response, plaintiff provided Carilli with a letter dated October 8, 2002, in which plaintiff's doctor, Thomas Feldman, stated that plaintiff is "in very good general health" and that he "has no health problems that would preclude his ability to work or carry out other normal functions."  Dr. Gerson Sternstein, in a letter dated December 2, 2002, also wrote that plaintiff could "return to work full-time without restriction" and had been able to since October 9.

Despite this letter, Carilli believed that plaintiff should be evaluated by a physician selected by the City.  Byrne informed plaintiff via letter dated February 11, 2003 that an appointment with Dr. Thomas Devers had been scheduled for March 4. After his evaluation, Dr. Devers pronounced plaintiff fully recovered from his Hepatitis C and able to resume working.  Plaintiff returned to work on March 17.

On June 13, plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") alleging that the City of New Britain had retaliated and harassed him based on his disability in violation of the ADA and section 46a-60(a)(1) of the Connecticut General Statutes.

On June 23, plaintiff was notified of a fact-finding hearing regarding his attendance in the previous months. On September 22, an arbitration hearing was scheduled regarding plaintiff's grievance of his twenty-day suspension in September 2002; this grievance was settled and withdrawn with prejudice.

On September 30, 2003, plaintiff received a negative performance evaluation from his supervisor, Larry Hinchcliffe, which covered the period from July 20, 2003 through September 19, 2003. Hinchcliffe's review noted plaintiff's tardiness, poor attitude and that plaintiff "has to be told and watched on most assignments." This evaluation was signed by Steve Cowperthwaite, plaintiff's general foreperson, who noted "I agree with supervisor's comments." Plaintiff responded in writing, "I'm sorry I let my supervisor down. I disagree with some of the evaluation. In the future I will work to improve toward their standards." Finally, this evaluation indicated that plaintiff would be reevaluated on or about November 30.

On October 7, plaintiff and defendant City executed a General Release and Agreement in which plaintiff released "the City of New Britain, the Public Works Department, the Public Works Commission" from any claims that plaintiff may have arising out of his employment, including those arising under Title VII, the ADA and section 31-51q of the Connecticut General Statutes. Pursuant to this agreement, all previous disciplinary action taken against plaintiff would remain part of his record and

the City would not pursue discipline against plaintiff for his tardiness during the spring 2003.

In a letter dated November 13, 2003, Carilli informed plaintiff that he was late to work on six of the previous fifteen work days and that he had been reported leaving his work site without permission, using a city vehicle without permission and traveling with a city vehicle outside the city limits. Therefore, a fact finding hearing would be held for plaintiff to respond to these issues. Plaintiff claims that these violations were due to his ongoing medical condition.

On December 3, 2003, Hinchcliffe again evaluated plaintiff and noted that plaintiff "needs improvement" in the "Reporting to Work" category and was "unacceptable" in the Promptness and Overall Evaluation categories. Hinchcliffe's comments in this evaluation mirrored his earlier comments regarding plaintiff's promptness and dependability. Cowperthwaite stated that plaintiff "needs to improve in many areas. Most elements are in his control and he needs to realize that he is the one who has to change." Carilli agreed with this evaluation.

On December 18, Carilli recommended to Byrne, the head of personnel, the termination of plaintiff based on, defendants allege, plaintiff's tardiness and unwillingness to adhere to the rules of his department. Byrne, in turn, consulted with Mayor Timothy Stewart who, according to defendants, suggested that the recommendation be delayed to allow plaintiff an opportunity to improve.

On February 4, 2004, plaintiff used a city vehicle to leave his work site to get personal items from his residence. While traveling, plaintiff was involved in an automobile accident that resulted in damage to private property. Plaintiff asserts that

he received permission from the snow removal operations supervisor, Conrad Conforto, to do this.  Defendants contend that Mr. Conforto did not have the authority to grant this permission.

On February 19, 2004, plaintiff was transferred from the Street Division to the City Yard.  The following day, plaintiff was given a written warning for leaving his work site in violation of his supervisor's direction.  Plaintiff responded in writing to Carilli, noting that other employees use city vehicles to get coffee and that he was depressed and such depression prevented him from getting to work punctually.

On February 27, 2004, Carilli wrote to Byrne asking Byrne to pursue Carilli's recommendation that plaintiff be terminated in light of plaintiff's recent actions.  On March 3, 2004, Byrne informed plaintiff that he was being terminated in accordance with Carilli's recommendation.

Plaintiff filed a complaint with the CHRO on July 12, 2004.  This complaint was dismissed.

**DISCUSSION**

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute.  Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F. 2d 348, 351 (2d Cir. 1981).  In determining whether a genuine factual issue exists,

the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then summary judgment is appropriate.  <u>Celotex Corp.</u>, 477 U.S. at 323.  If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met.  <u>Liberty Lobby</u>, 477 U.S. at 24.

## I.  Discrimination Based on Disability

Plaintiff alleges that he was discriminated against based on his disability and his perceived disability - specifically, his Hepatitis C.  Defendants seek summary judgment on the grounds that plaintiff is not disabled under the ADA.

To establish a prima facie case for discrimination under the ADA, plaintiff must show that (1) defendant is subject to the ADA; (2) plaintiff was perceived to be disabled within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability.  <u>Jacques v. Dimarzio</u>, Inc., 386 F.3d 192, 198 (2d Cir. 2004).  If plaintiff presents a prima facie case, defendant may rebut it by articulating a non-discriminatory business reason for the adverse employment action.  <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 468 (2d Cir. 2001).  The plaintiff must then prove by a preponderance of the evidence that the supposed legitimate reason is actually a pretext for discrimination.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515 (1993).

Under the ADA, a "disability" is defined as "a physical or mental impairment that

substantially limits one or more of the major life activities of such individual" or "being regarded as having such an impairment."  42 U.S.C. § 12102(2)(A), (C).  The Supreme Court has observed that a "disability exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken."  Sutton v. United Air Lines, 527 U.S. 471, 482 (1999).  The Court further commented that, while an individual should be evaluated in his corrected state, treating the disability does not automatically mean that the individual is not disabled.  Rather, it is necessary to evaluate the individual in his treated state to determine whether he is disabled under the law.

In order to demonstrate a perceived disability under section 12102(2)(C), the plaintiff must demonstrate that (1) a covered entity mistakenly believes that he has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities.  Giordano v. City of New York, 274 F.3d 740, 748 (2d Cir. 2001).

Plaintiff alleges that the major life activities that were substantially limited were his ability to work and his ability to drive.  The ability to work and the ability to drive are both major life activities.  Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998) (finding that the ability to work is a major life activity); Reg'l Econ. Cmty. Action Program v. City of Middletown, 294 F.3d 35, 46 (2d Cir. 2002) (finding that the ability to drive is a major life activity); 45 C.F.R. § 84.3(j)(2)(ii).

It is also necessary that the life activity be substantially limited.  The substantial limitation factor requires the court to examine the nature, severity, duration and long

10

term impact of the impairment.  See Ryan, 135 F.3d at 870.  In Ryan, the Court of

Appeals for the Second Circuit ruled that plaintiff's colitis did not severely impair any of

plaintiff's major life activities.  Specifically, the Court found that although plaintiff's

illness was severe, its duration did not meet the level of "substantial" because it was

asymptomatic for long periods and varied in intensity when it did occur.  The Court

recognized that plaintiff's condition would persist and had no cure, but nonetheless,

concluded that the fact that plaintiff's condition was "asymptomatic for long periods, and

varie[d] in intensity, weighs against a finding of substantial limitation."  Id. at 871.  The

Court also found the cyclical nature of plaintiff's condition militated against a finding of a

significant impact on plaintiff's activities.

    The relevant period for determining when plaintiff was actually disabled is from

July 29, 2002, the date of Dr. Zayas's initial letter to Byrne stating that plaintiff would

"highly benefit" from taking time of, through August 26, 2002 when Dr. Zayas informed

Byrne that plaintiff could return to normal work duty, plaintiff was indeed "disabled"

under the law.  This short time period, even if plaintiff's condition should reoccur,

supports a finding that plaintiff was not disabled under the law because plaintiff was not

"substantially impaired" within the meaning of the ADA and Ryan.

    For purposes of evaluating plaintiff's perceived disability claim, plaintiff must

demonstrate that defendants believed that his disability prevented him from "working in

a broad range of jobs suitable for a person of [his] age, experience, and training

because of [his] disability."  Id. at 872.  The relevant time period for this analysis is July

29, 2002 through March 17, 2003, when Dr. Devers allowed plaintiff to return to normal

work duties.  According to Dr. Zayas, plaintiff was able to fully perform his work as of

August 26, 2002. During the seven-month period from August 2002 to March 2003, plaintiff was able to resume his full duties, although defendants would not allow him to return because of his perceived disability. It is apparent that defendants believed that plaintiff was disabled under the law during this time, as he was not permitted to return to his normal duties, nor to any other position in defendants' department for which plaintiff may have been suitable. Therefore, plaintiff has established that he was perceived to be disabled.

Defendants argue that plaintiff's termination was due to his litany of suspensions, punishments and repeat offenses recounted above - a legitimate, non-discriminatory reason for his termination.

The crux of plaintiff's argument that defendants' reasons for his termination were pretextual is that other employees committed similar violations and were not fired. A showing that similarly-situated employees outside the protected class received more favorable treatment can serve as evidence of pretext, but only if the plaintiff shows that he was "similarly situated in all material respects" to the comparators. Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). To be similarly situated in all material respects, a plaintiff must show that the individuals were subject to the same discipline standard and that these individuals engaged in conduct comparable to that of the plaintiff. Hogan v. Conn. Judicial Branch, 220 F. Supp. 2d 111, 119 (D. Conn. 2002).

The Court has almost no information about the identities of the alleged comparators and plaintiff's assertions that other employees made the same transgressions as he did are not supported by any sworn affidavit or any other admissible document. Therefore, such statements cannot create a material issue of

fact.  See Barlow v. Connecticut, 319 F. Supp. 2d 250, 260 (D. Conn. 2004) ("[G]eneral averments or conclusory allegations of an affidavit do not create specific factual disputes.").  Similarly, plaintiff's claim that he was terminated as a means to keep him out of work due to his disability is unsupported by any admissible and relevant evidence.  Therefore, summary judgment is appropriate on this count.

## II.    Denial of Equal Protection Rights

Plaintiff contends that he was denied his equal protection rights under the law in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.  Plaintiff's claims is presumably made under a "class of one" theory whereby "the plaintiff alleges that [ ]he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

To succeed under a "class of one" theory, plaintiff must "demonstrate that there were other employees who were similarly situated to [him] in all material respects." Goldfarb v. Town of West Hartford, 474 F. Supp. 2d 356, 367 (D. Conn. 2007). Although "as a general rule, whether items are similarly situated is a factual issue that should be submitted to the jury[,] ... this rule is not absolute ... and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."  Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001).

Plaintiff has failed to demonstrate that he was similarly situated to any other employees sufficiently to establish a "class of one" theory.  Of the admissible evidence, plaintiff can only point to a list of other employees with disciplinary records.  This list

13

lacks any sort of identifying detail necessary in support plaintiff's argument.  In fact,

plaintiff implicitly concedes that this evidence is insufficient when, in response to

defendants' statement concerning this list, plaintiff wrote in his Statement of Disputed

Facts, "Deny there is any record that the aforementioned discipline was imposed for the

stated reasons."

Plaintiff's other evidence, including documents signed by his coworkers and

former coworkers, does not meet the requirements for evidence under Local Rule

56(a)(3) and therefore cannot support plaintiff's claim.

For these reasons, summary judgment will be granted on this count.

## III.    Claims under the First Amendment

Plaintiff claims that he was retaliated against in violation of the First Amendment

to the United States Constitution and Conn. Gen. Stat. § 31-51q.  Section 31-51q

provides, in pertinent part:

> Any employer, including the state and any instrumentality or
> political subdivision thereof, who subjects any employee to
> discipline or discharge on account of the exercise by such
> employee of rights guaranteed by the first amendment to the
> United States Constitution..., provided such activity does not
> substantially or materially interfere with the employee's bona
> fide job performance or the working relationship between the
> employee and the employer, shall be liable to such employee
> for damages caused by such discipline or discharge, including
> punitive damages, and for reasonable attorney's fees as part
> of the costs of any such action for damages.

Connecticut courts have concluded that the application of section 31-51q is coextensive

with that of the First Amendment, and therefore, the two provisions are to be interpreted

identically.  See Sturm v. Rocky Hill Bd. of Educ., 2005 U.S. Dist. LEXIS 4954 (D.

Conn. Mar. 29, 2005).

14

Courts have recognized the rights of government employees as public citizens to free speech as well as the government's "interest in promoting efficient public service by its employees and may regulate its employees' speech." Hale v. Mann, 219 F.3d 61, 70 (2d Cir. 2000). "When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences." Garcetti v. Ceballos, 547 U.S. 410, 423 (2006).

To support a claim that he was retaliated against for his speech, plaintiff must show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action. Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003). Speech is in a matter of public concern if relates "to any matter of political, social, or other concern to the community." Connick v. Myers, 461 U.S. 138, 146 (1983).

The Court of Appeals for this circuit has recognized that "[w]hether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999). Where the speech is on a matter of personal interest only, the "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary...." Connick, 461 U.S. at 146.

Defendants contend that plaintiff's speech - that is, his filing of an ADA complaint with the CHRO and the EEOC - was not of public concern. Plaintiff argues, in his

response to the motion, that the speech was his statement to Carilli that other employees violated department rules in 1996.  In his complaint, plaintiff alleges that the public speech was contained in his CHRO complaint received June 13, 2003.

Regardless of which event plaintiff was allegedly retaliated for, neither rises to the level of public concern.  In the CHRO complaint, plaintiff makes no allegations of department employees violating department rules.  In fact, the CHRO complaint is entirely a litany of personal grievances addressing plaintiff's treatment as he recovered from Hepatitis C and attempted to return to work.  Such a personally-focused complaint is not of public concern.  See Ericson v. City of Meriden, 113 F. Supp. 2d 276, 290 (D. Conn. 2000) ("[Plaintiff's] complaint is based on her individual employment situation, and is therefore personal in nature."); see also Alexander v. City of New York, 2004 U.S. Dist. LEXIS 17042, *39 (S.D.N.Y. Aug. 24, 2004) ("[F]or purposes of a First Amendment retaliation cause of action, complaints about individual acts of discrimination or harassment are not generally deemed to be of public concern.").

The 1996 instance does not allege any matter of public speech, but is instead a statement by Carilli, in disciplining plaintiff for returning home during the workday, that "not only can the presence of a city truck at your residence during the workday readily lead to the worse case assumption by any citizen, but it is violative of Department Rules."  There is no indication that this is speech (1) by the plaintiff (2) on a matter of public concern.  Even if it could be construed that this is speech by the plaintiff on a matter of public concern, the alleged retaliation occurred no less than six years later. Plaintiff has failed to show that he suffered an actionable adverse employment action

during this time that could be traced to the 1996 communication.  See De La Cruz v. Guiliani, 2002 U.S. Dist. LEXIS 19922 (S.D.N.Y. Aug. 23, 2002) (denying First Amendment retaliation claim where plaintiff could show no adverse employment action).

Summary judgment is therefore appropriate on counts II and III of plaintiff's complaint.

## IV.    Retaliation under the ADA

Although plaintiff makes his retaliation claim under Title VII, it appears that plaintiff meant to assert this claim under the ADA and defendants have assumed this as apparent from their replies.  Therefore, the Court will also assume plaintiff meant to assert his retaliation claim under the ADA.

The retaliation provision of the ADA, 42 U.S.C. § 12203, provides that no "person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act."  Section 12203(b) makes it unlawful "to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed … any right granted or protected by this chapter."  Section 12203(c) explicitly adopts the same remedies for violations of the retaliation and intimidation provisions as are available under section 12117 for violations of the ADA's prohibition against discrimination and failure to accommodate.

To state a claim for retaliation under the ADA, a plaintiff must allege that: (1) he engaged in a protected activity; (2) the employer knew about his participation in the

17

protected activity; (3) an adverse employment action occurred; and (4) there is a causal connection between the adverse employment action and the employee's participation in the protected activity. Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d. Cir. 1999).

_____Defendants concede that plaintiff has met the first and second prongs of this test, but argue that plaintiff cannot show a causal connection between plaintiff's participation in a protected activity and his termination. As was true for the discrimination under the ADA analysis, plaintiff again cannot show that defendants' reasons for their actions were pretextual. The evidence offered fails to evince that he was treated any differently by defendants because of his filing a complaint with the CHRO. While there certainly was an adverse action taken against him, defendants have proffered a legitimate reasons for said actions, reasons which plaintiff is unable to rebut. Further, the cases cited by plaintiff do not assist plaintiff in his efforts to create a disputed issue of material fact.

Summary judgment is therefore appropriate on this count.

## V.     Denial of Due Process Rights Under the Fourteenth Amendment

Plaintiff claims that he was terminated in violation of his due process interest in continued employment. Defendants seek summary judgment on the grounds that plaintiff did not have a continuing interest in his employment because he was an at-will employee, and, alternatively, the two defendants are immune from suit. Specifically, defendant Carilli is not liable on this ground because he was not the decision-maker who actually terminated employee, and defendant City may not be held liable under a respondeat superior theory.

18

An employee's due process rights may be violated during his termination only if he has a property right in his continued employment as determined by an independent source, such as state law.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985).  While plaintiff alleges that he held a property interest in his continued employment, he neither provides nor points to any law, case, statute, city charter, contract or collective bargaining agreement which provides or defines that right.  See Levesque v. Town of Vernon, 341 F. Supp. 2d 126 (D. Conn. 2004) (reviewing town charter to determine employee's property interests in continuing employment); see also Conn. Gen. Stat. § 7-474(f) (providing that a collective bargaining agreement supercedes a municipal charter on certain employment matters).  Therefore, defendants are entitled to summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court will GRANT defendants' motion for summary judgment (Doc. #25).  The Clerk is instructed to close this case.

Dated at Bridgeport, Connecticut, this 21st day of May, 2008.


_____/s/_____
Warren W. Eginton
Senior United States District Judge